IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

PAUL CASE                                                                                    PLAINTIFF

v.                                          CIVIL NO. 14-2067

CAROLYN W. COLVIN, Acting Commissioner
Social Security Administration                                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Paul Case, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claim for a period of disability and disability insurance benefits (DIB) under the provisions of

Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's decision.

*See* 42 U.S.C. § 405(g).

## I. Procedural Background

Plaintiff protectively filed an application for DIB on August 16, 2011, alleging disability

since November 11, 2010, due to: cervical fusion, lower back pain, a left shoulder injury, and post-

traumatic stress disorder (PTSD). (Tr. 13, 146, 179). For DIB purposes, Plaintiff retains insured

status through December 31, 2015. (Tr. 15, 143). An administrative hearing was held on September

21, 2012, at which Plaintiff appeared with counsel and testified. (Tr. 29-55).

By a written decision dated November 8, 2012, the ALJ found Plaintiff had the following

severe impairments: "degenerative disc disease of the cervical spine status post fusion, herniated

nucleus pulposus status post fusion, and torn left rotator cuff." (Tr. 15). After reviewing all of the

evidence presented, the ALJ determined Plaintiff's impairments did not meet or equal the level of severity of any impairment in the Listing of Impairments. (Tr. 16). The ALJ then found Plaintiff had the residual functional capacity (RFC) to perform the full range of light work. (Tr. 16).

With the help of a vocational expert (VE), the ALJ determined Plaintiff could not perform his past relevant work (PRW).  (Tr. 22, 48). The ALJ then evaluated whether Plaintiff retained the capacity to perform other work existing in the national economy, considering his age, education, work experience, and RFC. Based upon Medical-Vocational Guidelines Rule 202.21, the ALJ determined there were a significant number of jobs in the national economy Plaintiff could perform. (Tr. 22). The ALJ concluded Plaintiff had not been under a disability as defined by the Act during the relevant time period. (Tr. 22).

Plaintiff next requested a review of the hearing decision by the Appeals Council, which denied the request on January 21, 2014. (Tr. 1-4). Subsequently, Plaintiff filed this action on March 27, 2014. (Doc. 1).  Both parties have filed appeals briefs, and the case is before the undersigned for report and recommendation. (Docs. 10, 11).

## II. Evidence Presented

The evidence before the relevant time period, in pertinent part, shows Plaintiff suffered a workplace injury in June 2010 while lifting heavy freight. (Tr. 272, 282, 296). Evidence also shows Plaintiff was treated for PTSD. In November 2009, Plaintiff was assessed with PTSD by Brian Tankersley, a VA physician assistant, who assigned Plaintiff a GAF score of 65 and prescribed alprazolam and fluoxetine. (Tr. 703-706). In January 2010, Plaintiff had a follow-up with Mr. Tankersley, but reported he had discontinued fluoxetine and was not depressed. (Tr. 694). Mr. Tankersley assigned Plaintiff a GAF score of 67 and switched Plaintiff's antidepressant to

buproprion and added temazepam. (Tr. 695-696). On February 2, 2010, Plaintiff saw Mr. Tankersley, and reported alprazolam and temazepam had improved his sleep, denied depression, and stated sleeping was his primary problem. (Tr. 690). Mr. Tankersley assigned Plaintiff a GAF score of 55 at the visit. (Tr. 692). The same day, Plaintiff met with VA social worker Linda Bell, who advised Plaintiff to consider an inpatient PTSD treatment program, which Plaintiff declined. (Tr. 538, 686-687).

On March 15, 2010, Plaintiff had a mental health follow-up with Dr. Han Soe, a VA psychiatrist. (Tr. 681). Plaintiff reported he was not depressed and explained he was not interested in a residential treatment program because of his busy work schedule. (Tr. 681). Dr. Soe prescribed sertraline instead of buproprion. (Tr. 681-683). Plaintiff next met with Dr. Soe, on June 14, 2010, and reported he had decided to stop taking sertraline and temazepam and stated, "right now, my back is my main problem." (Tr. 668-669). Dr. Soe noted Plaintiff had a non-depressed, euthymic mood during the visit and assigned Plaintiff a GAF score of 61. (Tr. 669).

The evidence during the relevant time period is the following. On December 15, 2010, Dr. Robert Fisher performed an epidural steroid injection in Plaintiff's spine at the L5-S1 level to relieve back pain Plaintiff had experienced since his lifting accident. (Tr. 278).

On December 16, 2010, Plaintiff was examined by Dr. Shirin Desilva, a VA physician, to determine Plaintiff's service connected disability and compensation. (Tr. 587-598). Plaintiff reported he had constant numbness, pain radiating from his hip to his toes in his left leg, numbness in his left arm, depression, and anxiety. (Tr. 589-590). Dr. Silva noted Plaintiff had normal mood and affect; was able to tie his shoes and remove his clothes for the exam; and walked normally, although he wore a back brace. (Tr. 591). Plaintiff's left shoulder was weaker and higher than his right shoulder,

but his left shoulder range of motion was within normal limits, his strength in all of his extremities was 5/5, and his reflexes were normal. (Tr. 592-594). A nerve conduction test showed Plaintiff's senses were normal except for a mild abnormality in Plaintiff's right lower extremities that was "consistent with [his] history of remote L5/S1 fusion." (Tr. 596-597). Pulmonary function testing was normal and showed a mild response to a bronchodilator. (Tr. 534-535, 709). Dr. Desilva opined there was no evidence of ongoing injury to Plaintiff's nerve roots and "nerve conduction studies show no evidence of sensory nerve injuries to any extremity." (Tr. 597-598).

Plaintiff was examined by Jon Keller, PA-C, on December 21, 2010, as part of Plaintiff's compensation and pension claim with the VA. (Tr. 616-633). Mr. Keller opined Plaintiff's "asthma is controlled and PT able to work with this condition. PT's 'LS spine' limits his ability to perform heavy lifting and prolonged standing–PT able to do sit down work and some work with minimum lifting and standing. PT's EMG [results are within] NL's and his nerves should not limit work." (Tr. 633).

On January 7, 2011, Plaintiff had a mental health follow-up with Dr. Soe, and reported limited activity, anxiety, and insomnia. (Tr. 612). Dr. Soe noted Plaintiff had normal mood and affect, assessed Plaintiff with chronic PTSD, and scored Plaintiff's GAF as a 61. (Tr. 613). Plaintiff's sertraline prescription was continued at 100 mg. daily. (Tr. 613-614).

On January 17, 2011, Plaintiff received a second epidural injection from Dr. Fisher at the L5-S1 level to treat his back pain. (Tr. 272). On February 21, 2011, Plaintiff received a third epidural injection. (Tr. 276).

On February 22, 2011, Plaintiff was seen by Dr. Arthur Johnson for left arm pain and numbness, left shoulder pain, and back pain. (Tr. 272). Dr. Johnson examined Plaintiff and assessed

Plaintiff's strength was 5/5 in his upper extremities; there was some tenderness over the Guyon's canal and ulnar tunnel in his elbow; and Plaintiff had "a positive Spurling sign with the rotation of his neck to the left." (Tr. 273). An MRI of Plaintiff's cervical spine showed some degenerative disc disease changes with disc bulges at the C4-5, C5-6, and C6-7 levels, particularly toward the left, and left-sided neuroforaminal narrowing at all three levels. (Tr. 273). X-rays of Plaintiff's cervical spine showed normal alignment and disc space height with some mild degenerative disc disease changes. (Tr. 275). Dr. Johnson recommended cervical traction and physical therapy; prescribed Nucynta 50 mg. and Celebrex 200 mg. twice daily; suggested using Osteo Bi-Flex, omega-3 and alpha lipoic acid supplements; and recommended an anti-inflammatory, low sugar diet. (Tr. 273).

Plaintiff began physical therapy at the River Valley Rehab Center on February 28, 2011. (Tr. 266-267). Physical therapist David Fitting reported Plaintiff demonstrated some tenderness, but ambulated normally and exhibited no muscle guarding. (Tr. 266). Plaintiff's flexion and extension were within normal limits; left side bending was normal and right side bending was reduced 25-percent; left deltoid strength was 4/5 and left biceps strength was 5/5; right hand grip strength was fifty-four pounds; and left hand grip strength was fifty pounds. (Tr. 266). Mr. Fitting noted Plaintiff was able to stretch his left arm ten times, and established Plaintiff's goals as being pain free at rest within three weeks and pain free with range of motion in six weeks. (Tr. 267).

On March 7, 2011, Plaintiff saw Dr. James Blankenship for his back and shoulder pain. (Tr. 322-323). An MRI of his spine showed disc herniation on the left at the C5-6 level; neural foraminal stenosis of the C6 nerve root; and spondylosis with some narrowing of the neural exit foramen at the C7-T1 level. (Tr. 289-290). X-rays of Plaintiff's spine showed Plaintiff had restrolisthesis at the L4-L5 level in extension, and a solid fusion at the L5-S1 level. (Tr. 319). Dr Blankenship determined

Plaintiff had "left C6 radiculopathy secondary to disc herniation" and probable cuff tendinitis with the possibility of a tear, and opined, "there is no doubt that the left arm pain he is having is coming from the C5-C6 disc protrusion." (Tr. 322-323). Dr. Blankenship recommended surgical intervention to resolve Plaintiff's back and shoulder pain, and a shoulder MRI and consult with a shoulder specialist to rule out a rotator cuff tear. (Tr. 323).

Plaintiff underwent an MRI of his left shoulder on March 14, 2011, which showed some focal tendinopathy and "no evidence for a complete thickness tear." (Tr. 340). On March 17, 2011, Plaintiff had a follow-up with Dr. Blankenship, who examined Plaintiff, ordered new x-rays, and reviewed the recent MRI. (Tr. 337). Dr. Blankenship ruled out a rotator cuff tear, confirmed Plaintiff had segmental spine instability, and suggested Plaintiff could treat his condition "with just conservative treatment" or go ahead with a surgical intervention at the C5-C6 level. (Tr. 337). Plaintiff was told to continue physical therapy while awaiting surgery. (Tr. 338).

On May 18, 2011, Dr. Blankenship drafted a worker's compensation determination letter. (Tr. 335-336). Dr. Blankenship opined Plaintiff's shoulder impairment "would not bear out enough pathology for a rating" and his current disc herniation qualified him as 6-percent impaired. (Tr. 335). Dr. Blankenship suggested, based on a third party functional capacity evaluation and his own treatment notes, Plaintiff could perform medium work, lift up to fifty pounds, and lift twenty-five pounds overhead. (Tr. 335). Dr. Blankenship noted Plaintiff had declined further surgery, there were questions whether surgical intervention would be appropriate based on Plaintiff's "inappropriate illness behavior" and "unreliable effort," and opined Plaintiff would not benefit from further treatment other than physical therapy. (Tr. 335).

Plaintiff saw Dr. Blankenship on June 2, 2011, for pre-operation exam. (Tr. 296). Plaintiff demonstrated good strength and sensory reflex in his extremities with the exception of decreased sensation in his left hand. (Tr. 296-297). On June 8, 2011, Dr. Blankenship performed an anterior cervical discectomy and arthrodesis at the C5-6 level. (Tr. 294, 298-299). Post operation x-rays showed a successful surgery, and Plaintiff demonstrated 5/5 arm strength with good hand grip after the procedure. (Tr. 294, 299-300). Plaintiff was discharged with pain medication and instructions to begin a physical therapy program. (Tr. 294-295). Follow-up x-rays of Plaintiff's spine on June 23, 2011, continued to show a successful operation. (Tr. 317).

Physical therapy notes from June 22, 2011, show Plaintiff's condition had improved since the spine surgery, the discomfort in his left arm had subsided, and he had generally mild pain that was controlled by medications and ice. (Tr.454). On July 20, 2011, physical therapist Brady McCollum reported Plaintiff "was much improved" with less cervical and lumbar pain from physical therapy treatment. (Tr. 437). Mr. McCollum noted Plaintiff "has made significant improvement since surgical intervention with significantly decreased cervical and left upper extremity and significantly decreased lumbar symptoms." (Tr. 437). Physical therapy notes from Mr. McCollum in September 2011 indicate Plaintiff had seen significant cervical range of motion improvement and his main complaint was an onset of recent headaches. (Tr. 402). Mr. McCollum reported, "overall [Plaintiff] has made significant progress (via decreased impairments) regarding his s/p ACF with decreased pain and spasms, increased strength and increase range of motion resulting in improved function." (Tr. 402-403).

On June 23, 2011, Plaintiff saw Dr. Blankenship and reported "he [was] doing fantastic from the standpoint of his neck with a complete resolution of his radicular pain and marked improvement

-7-

of his paresthesias." (Tr. 330). Plaintiff stated some shoulder and low back pain remained, and Dr. Blankenship suggested more physical therapy and trying a steroid injection. (Tr. 330). On July 21, 2011, Plaintiff had a follow-up with Dr. Blankenship who noted, "his low back pain is actually significantly better with conservative treatment plan ... his main problem is his left shoulder pain." (Tr. 328). X-rays showed Plaintiff's spine was stable and there were no surgical complications. (Tr. 344). Dr. Blankenship referred Plaintiff to Dr. Mark Powell for a shoulder evaluation. (Tr. 328).

On August 2, 2011, Plaintiff saw Nelson Seal, APN, who performed a new VA compensation and pension examination. (Tr. 581-607). Plaintiff reported no significant changes in his lumbar spine, and a reduction in left shoulder and arm numbness. (Tr. 581-582). Notably, Plaintiff's neck exam was normal; his spine exam was normal, although he had "slight increased lumbar tension;" his extremities were normal with 5/5 strength; his reflexes were normal; and he showed good mood and affect. (Tr. 599-604). According to Dr. Lance Runion, x-rays of Plaintiff's spine showed no compression deformities, no change in disk spaces, and no significant change in the appearance of his spine post fusion. (Tr. 605). Nurse Seal opined Plaintiff's back condition had a mild impact and "less physically demanding labor options are well within his age, physical, and cognitive abilities." (Tr. 606-607).

On August 4, 2011, Plaintiff established care with Dr. Powell for left shoulder pain. (Tr. 312). An exam of Plaintiff's shoulder showed normal shoulder range of motion, slight biceps tenderness, and no joint tenderness; but Plaintiff's neck was tender and showed limited range of motion. (Tr. 312). X-rays of Plaintiff's shoulder were within normal limits, and an MRI of Plaintiff's shoulder showed tendinopathy, but no evidence of a tear. (Tr. 312-313, 315). Dr. Powell

recommended "conservative treatment for his left shoulder that included a cortisone injection and physical therapy." (Tr. 313).

On August 19, 2011, Plaintiff had a mental health follow-up with Dr. Soe and reported his medications were helping his mood, although he was having insomnia, and expressed his interest in vocational retraining and education. (Tr. 558). Dr. Soe noted Plaintiff's VA disability rating for PTSD had recently been increased from 30-percent to 70-percent (now 90-percent overall), assessed Plaintiff with chronic PTSD, assigned a GAF score of 61, and continued Plaintiff's alprazolam and sertraline prescriptions. (Tr. 558-560). Plaintiff met with Dr. Magdelena Santos the same day and complained of a rash, sleep apnea, chronic back pain, obesity, abnormal blood sugar, asthma, and hyperlipidemia. (Tr. 568). Plaintiff's exam was normal, and Dr. Santos did not prescribe any medications. (Tr. 570). Dr. Santos advised cutting down on carbohydrates and dairy for his hyperlipidemia, continuing to use his CPAP machine for sleep apnea, and compliance with the VA's nutrition and iMove program for his obesity and blood sugar. (Tr. 570-571). Plaintiff had a mental health follow-up on August 26, 2011, and reported medication was working for his mood, although he was having problems sleeping more than three to four hours a night because of pain and nightmares. (Tr. 559-560).

On September 15, 2011, Plaintiff saw Dr. Blankenship for a follow-up, who prescribed meloxicam and Celebrex and referred Plaintiff to Dr. David Cannon for a Z-joint injection. (Tr. 325). X-rays of Plaintiff's spine indicated no changes and continued to reflect a successful surgical intervention. (Tr. 343).

Plaintiff saw Dr. Powell on September 15, 2011, for a shoulder check-up. (Tr. 368). Plaintiff's AC joint was tender to palpation and rotation, his shoulder strength was 4/5, and his exam

was "negative for Neer, Hawkins, and cross-body impingement." (Tr. 368). Plaintiff received a cortisone injection in his left shoulder AC joint, and was told to continue physical therapy. (Tr. 368, 372).

Physical therapy progress notes from October 5, 2011, indicate Plaintiff experienced low back pain if he walked more than 400 yards or sat for extended time periods. (Tr. 392). On October 31, 2011, physical therapy notes show Plaintiff believed his shoulder function had subjectively improved fifty-percent, and Mr. McCollum noted Plaintiff had full shoulder range of motion, but pain on active overhead reaching. (Tr. 380).

Plaintiff established treatment with Dr. Robert Cannon on October 6, 2011, for his back and neck pain, specifically with extension and twisting. (Tr. 362). Plaintiff's exam showed good grip strength, but tenderness and limited range of motion on flexion, extension, and twisting; diminished sensation at the C6-C7 distribution; positive left leg raises and negative right leg raises; and a slight list on the left in his gait; and an ability to toe and heel walk, but with some difficulty on the left. (Tr. 363). Dr. Cannon recommended an L4-L5 fact injection to relieve nerve root pain. (Tr. 363). On October 26, 2011, Plaintiff received an steroid injection from Dr. Canon at the L4-L5 level. (Tr. 360).

On November 1, 2011, Plaintiff saw Dr. Powell and reported relief from his cortisone injection, improvement from attending physical therapy three times a week, but stated his "left shoulder still bothers him." (Tr. 366). Dr. Powell's examination showed normal range of motion and grip strength, and Dr. Powell assessed Plaintiff with left shoulder AC joint osteoarthritis and impingement. (Tr. 366). Dr. Powell suggested, "he may need to be retrained for a job that eliminates overhead work," and presented surgery as an option, which Plaintiff declined. (Tr. 366-367, 369).

Dr. Valeria Malak submitted a physical RFC assessment dated November 8, 2011, and opined Plaintiff could lift ten pounds frequently and twenty pounds occasionally; sit, stand, or walk about six hours each in an eight hour work day; push or pull without limitations; climb, balance, kneel, and crawl frequently, and stoop and crouch occasionally; could handle, finger, and feel without limitations; could occasionally reach overhead; and had no visual, communicative, or environmental limitations. (Tr. 489-492). Dr. Malak concluded Plaintiff had a "light RFC with postural restrictions and limited overhead reaching." (Tr. 495). Dr. Ronald Davis affirmed Dr. Malak's opinion on March 2, 2012. (Tr. 731).

Dr. Powell submitted a letter dated November 29, 2011, as part of Plaintiff's workers compensation claim and opined Plaintiff had a 1-percent impairment rating as a result of his shoulder condition. (Tr. 369). On December 15, 2011, Plaintiff saw Dr. Blankenship and reported he was pleased with his recent surgery. (Tr. 715). There were no changes on Plaintiff's x-rays or his exam. (Tr. 715, 721). Dr. Blankenship wrote a letter dated the same day and opined Plaintiff had recurrent disc protrusion at the lumbrosacrum and was about 15-percent limited in total. (Tr. 713). Dr. Blankenship believed Plaintiff could perform medium work based on an ability to lift fifty pounds on a very occasional basis and twenty-five pounds frequently, although he should have a thirty pound lifting restriction overall. (Tr. 718-719).

Plaintiff had a follow-up with Dr. Santos on January 26, 2012, and reported he was having back and neck pain, insomnia, and needed a new back brace ordered. (Tr. 766-767, 772). Dr. Santos's exam showed Plaintiff had no back tenderness, no leg weakness, and normal range of motion. (Tr. 767). Dr. Santos also noted Plaintiff no longer needed specialized mental health intervention based on his current mental health progress and screening responses. (Tr. 767). Plaintiff

visited with his VA iMove coordinator the same day, who noted Plaintiff was not exercising enough and had gained one inch in his waistline since beginning the program. (Tr. 768-769). Plaintiff reported he had significantly cut back on sodas and was considering purchasing a Bowflex machine to workout on at home. (Tr. 768).

Dr. Jon Mourot, a State non-examining psychiatrist, submitted a Mental RFC assessment dated March 7, 2012, and stated "it appears claimant is able to perform work where interpersonal contact is routine, but superficial; complexity of tasks is learned by experience; tasks have several variables and require judgment within limits; and supervision required is little for routine, but detailed for non-routine tasks." (Tr. 738). Dr. Mourot opined "objective evidence does not support marked impairment in adaptive function" and concluded Plaintiff could perform semi-skilled work. (Tr. 736-738).

Plaintiff had a mental health follow-up with Dr. Soe on April 18, 2012, and complained of problems with temper and nightmares. (Tr. 824). Plaintiff reported his daily activities as doing little, other than feeding his six dogs and taking his children to school. (Tr. 824). Dr. Soe noted Plaintiff had good mood and affect, did not seem bothered by pain during the session, and had normal thought content. (Tr. 824-825). Plaintiff reported his "mood was good, [and] his meds are working." (Tr. 826). Plaintiff was assessed with chronic PTSD, assigned a GAF score of 61, and his alprazolam sertraline medications were continued. (Tr. 825).

Dr. Blankenship submitted a physical Medical Source Statement dated May 21, 2012. (Tr. 781-784). According to Dr. Blankenship, Plaintiff could sit, stand, or walk less than one hour during an eight hour work day; would need a sit/stand option; could use his hands to grasp and manipulate objects; could use his hands for repetitive tasks, but could not adequately push and pull objects;

-12-

could not use his feet for repetitive movements such as operating foot controls; could occasionally lift up to ten pounds, but never more than ten pounds; could occasionally balance, but never climb, stoop, kneel, crouch, crawl, or reach above shoulder level; and needed total restriction of activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dusts, fumes, and gases. (Tr. 781-782). Dr. Blankenship opined Plaintiff's pain was disabling to the extent it would prevent working even at a sedentary position. (Tr. 783).

On August 20, 2012, Plaintiff had a follow-up with Dr. Santos and reported worsening back pain and leg numbness, worsening asthma, no change in PTSD and weight, and improved sleep apnea with CPAP compliance. (Tr. 805-806). Plaintiff explained his shortness of breath from asthma and pain was interfering with his ability to exercise and complete physical therapy. (Tr. 808). Dr. Santos ordered an echocardiogram, a chest x-ray, and an MRI of Plaintiff's spine. (Tr. 808-809). Chest x-rays and the echocardiogram were normal and ruled out heart problems. (Tr. 787).  Dr. Santos also discharged Plaintiff from the VA's iMove program due to lack of progress and lack of exercise. (Tr. 805).

Plaintiff underwent an MRI of his spine on August 30, 2012, which showed a small volume of scar tissue near the S1 nerve root and showed mild degenerative facet joint disease at L4-L5, but was otherwise normal. (Tr. 787-788). Dr. Santos stated, "his MRI of lumbar spine showed no significant changes ... no evidence of nerve root compression ... some degenerative changes, expected for age," and recommended an epidural injection for pain relief. (Tr. 802-803).

### III. Applicable Law.

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his disability, not simply his impairment, has

lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require the application of a five-step sequential evaluation

process to each claim for disability benefits. *See* 20 C.F.R. § 404.1520(a)- (f)(2003). Only if the final

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in

light of his RFC. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§

404.1520, 416.920 (2003).

## III. Discussion

On appeal, Plaintiff argues the ALJ: (1) failed to adequately develop the record; (2) erred in

determining his credibility; and (3) erred in the RFC assessment. (Doc. 10 at 9-17).

### A. Development of the Record

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935,

938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of

Plaintiff's burden to press his case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ,

however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably

complete record. "Reversal due to failure to develop the record is only warranted where such failure

is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995).

Plaintiff does not allege a specific error by the ALJ other than mentioning "if the ALJ thought

that the Plaintiff's true work related restrictions were not evident from the record, we believe the

ALJ should have sought further clarification ... ." (Doc. 10 at 9).

The undersigned has carefully reviewed the record as a whole, which includes extensive

medical notes and diagnostic reports, the Medical Source Statement of Dr. Blankenship, the workers

compensation opinions from Dr. Blankenship and Dr. Powell, the VA disability examinations from Dr. Desilva and Nurse Seal, and the opinions of the State's consultative physicians. An ALJ should recontact a treating or consulting physician only if a critical issue is undeveloped. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). The undersigned believes the record contains sufficient evidence for the ALJ to evaluate Plaintiff's disability claim. *See McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011)("While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment ..."). There is also no evidence in the record nor an argument presented by Plaintiff showing he was prejudiced, and remand is only required when failure to develop the record further is prejudicial. *See Onstead v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

Accordingly, the undersigned finds the ALJ fully and fairly developed the record. *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).

**B. Credibility Determination**

Plaintiff argues the ALJ "did not give any solid, substantiated reasons for discrediting [his] testimony," and, more specifically, contends the ALJ did not make any mention of side effects from medications and should not have considered Plaintiff's missed appointments evidence of non-compliance. (Doc. 10 at 11-14).

The ALJ was required to consider all of the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and, (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a

-16-

claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. It is well established that "credibility is primarily a matter for the ALJ to decide." *Edwards*, 314 F.3d at 966. The ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible when contrary objective medical evidence exists. *Ramirez*, 292 F.3d at 581.

The ALJ addressed the *Polaski* factors in the written decision, but discounted Plaintiff's allegations of disabling pain. In addition to a lack of support in the medical record, the ALJ identified the following inconsistencies that weighed against Plaintiff's credibility: (1) Plaintiff self-reported daily activities, which included preparing meals, driving independently, washing laundry, taking care of his children, taking care of his six pets, and going fishing; (2) Plaintiff's statements to Dr. Blankenship his surgery significantly improved his back pain and range of motion, and multiple statements his left arm and back had improved; (3) Plaintiff's exercise activities, which included walking at least twice weekly and plans to purchase a Bowflex fitness machine; (4) Plaintiff's multiple missed appointments; (5) Plaintiff's ability to travel to Louisiana for vacation during the 2010 holiday season; and (6) the inconsistency between Plaintiff's responses on his Function Reports and the information he provided to physicians. (Tr. 16-21).

These were valid reasons for discounting Plaintiff's claims. *See e.g., Wildman v. Astrue*, 596 F.3d 959, 968-969 (8th Cir. 2010); *see also Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007)(deferring to the ALJ's credibility determination where the objective medical evidence did not support claims of physical impairments).

Although the ALJ did not discuss Plaintiff's side effects from medication in detail, an ALJ does not need to discuss each *Polaski* factor. *Strongson v. Barnhart*, 361 F.3d 1066 at 1072 (2004).

"It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Id*. The record also shows Plaintiff provided inconsistent responses regarding side effects. For instance, Plaintiff reported dizziness and drowsiness from Oxycontin and Celebrex on his Pain Questionnaire in August 2011, dizziness from sertraline and diclofenac on his Pain Questionnaire in December 1, 2011, and testified at his hearing he gets dizzy all the time. (Tr. 54, 164, 186). On a Pain Questionnaire dated December 13, 2011, Plaintiff, however, reported he suffered no side effects from Celebrex and diclofenac. (Tr. 206). Plaintiff similarly denied side effects from sertraline, Oxycontin, and diclofenac in his November 2011 Disability Report. (Tr. 181).

More importantly, Plaintiff did not address side effects with his physicians, with the exception of reporting, before the relevant time period, his antidepressants at the time caused dizziness, irritability, and lethargy. (Tr. 682, 697, 706). Plaintiff was switched to alprazolam, temazepam, and sertraline, which led to improvement. (Tr. 559,689-690, 694, 826). While the ALJ did not discuss Plaintiff's medications or side effects in detail, the ALJ's decision did not need to include a detailed discussion of how every *Polaski* factor because the analytical framework was recognized and considered. *See Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).

As for Plaintiff's missed appointments, the record shows Plaintiff canceled check-ups and did not show for appointments several times during the relevant time period. (Tr. 265, 608, 612, 698, 765, 778, 819). While these missed appointments are not by themselves fatal to Plaintiff's credibility, missed appointments tend to indicate Plaintiff was not entirely compliant with treatment protocols and his conditions were not as disabling as alleged.

The ALJ's credibility decision is entitled to deference because the ALJ identified substantial evidence in the record to support discounting Plaintiff's subjective allegations. *See Browning v.*

*Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) ("We will not disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."). Based on the foregoing, the undersigned finds the ALJ's credibility determination was based on substantial evidence.

### C. RFC

Plaintiff believes the ALJ erred by not including PTSD related limitations in the RFC, which he purports were supported by low GAF scores.[1]

RFC is the most a person can do despite that person's limitations, and is assessed using all relevant evidence in the record. 20 C.F.R. §404.1545(a)(1). This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of limitations. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §404.1545(a)(3). A claimant's RFC is a medical question, therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The ALJ is required to specifically set forth a claimant's limitations and to determine how those limitations affect his RFC. *Id.*

The undersigned first addresses Plaintiff's GAF scores. Within the relevant time period, Dr. Soe assigned Plaintiff a GAF score of 61 during his three mental health visits in January 2011,

---

[1]

Plaintiff specifically alleges the ALJ ignored a GAF score of 55, which was assigned by Brian Tankersley, a physicians assistant, on February 1, 2010, before the relevant time period. (Tr. 692). For comparison, Plaintiff GAF was otherwise scored between 61 and 67 during appointments in 2009 and 2010. (Tr. 669, 682, 695, 704).

August 2011, and April 2012. (Tr. 558, 613, 825). A GAF of 61 to 70 represents "some mild symptoms ... or some difficulty in social, occupational, or school functioning ..., but [the person] is generally functioning well ... ." *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000).[2]   In general, an ALJ is not required to address Plaintiff's GAF scores. *See Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)(stating the failure to reference a GAF score, standing alone, does not make the RFC inaccurate). The ALJ's decision not to address Plaintiff's GAF scores in detail was harmless since Plaintiff's scores supported the ALJ's finding that his PTSD was not a severe impairment. "An ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).

The ALJ concluded Plaintiff's PTSD was not a severe impairment because "the record reflects the claimant was able to successfully maintain employment ... for an extended period of time despite his condition." (Tr. 16). Plaintiff's employment after the onset of PTSD strongly suggests the ability to work, since there is no evidence of deterioration. *See Schultz v. Astrue*, 479 F.3d 979, 982-983 (8th Cir. 2007).

The record as a whole also supports the ALJ's conclusion that Plaintiff's PTSD was not disabling. Beyond the lack of evidence that Plaintiff's PTSD condition deteriorated after losing employment, Plaintiff consistently reported he was not depressed, was only partially compliant with taking medications, and declined residential treatment. (Tr. 538, 668, 681, 824). Dr. Santos

---

[2]

The GAF scale was not included in the most recent manual, in part, because of "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors." *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013)

suggested Plaintiff did not need intensive mental health treatment, and at his most recent visit with Dr. Soe, Plaintiff reported his mood was good and his medications were working. (Tr. 767, 826). After starting sertraline,  Plaintiff's PTSD was controlled, which indicated his condition was not disabling. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

While not addressed by Plaintiff in his brief, the undersigned has also closely examined the ALJ's decision to not include the non-exertional limitations recommended by the State's consulting physicians. (Tr. 495, 731). The ALJ determined Plaintiff did not have any non-exertional bending, stooping, or reaching limitations based on Plaintiff's activity level and examinations. (Tr. 20-21). Notably, Plaintiff did not seek specialized treatment for his shoulder or back after November 2011, declined additional surgery, and did not complain of shoulder pain to his treating physician, Dr. Santos. (Tr. 369, 568, 766-767, 805-806). According to Dr. Santos, Plaintiff's exams were normal at his January and August 2012 visits. (Tr. 766-767, 805-809).  Plaintiff's improvement after surgery and physical therapy, decision to discontinue treatment, and conservative treatment for back pain after November 2011 supported the ALJ's conclusion.

While evidence in the record suggests Plaintiff still experienced some pain, evidence detracting from Plaintiff's credibility makes other evidence suggesting disabling pain less credible as well, particularly in light of his documented activities. *See McCoy* 648 F.3d at 616-617.  The ALJ appropriately highlighted facts showing Plaintiff's behavior was consistent with light work, such as completing chores and exercising, and reports from Dr. Powell and Dr. Blankenship that showed Plaintiff had normal x-rays and normal range of motion in his back and shoulder. (Tr. 20-22, 312-313, 335, 366, 568).

Based on the foregoing, the undersigned finds that there is substantial evidence to support the ALJ's RFC findings.

**IV. Conclusion:**

For the above reasons, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of May, 2015.

/s/  *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE